# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

JOHN G. DAHLK,

        Plaintiff,

        -vs-                        Case No.   12-CV-0556

MICHELLE WOOMER,
TIMOTHY PIERCE,
STEPHANIE FRIEDMAN,
JUDY P. SMITH,
PATRICK MURPHY, and
MARY SAUVEY,

        Defendants.

# DECISION AND ORDER

This matter is now before the Court on the parties' cross-motions for summary judgment. The plaintiff also filed a motion for withdrawal of the plaintiff's affidavit because the version that was filed was not properly executed. With this motion, which is ministerial and will be granted, the plaintiff submitted a properly executed affidavit.

## I. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A.,*

*Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## II. FACTS

The plaintiff, John G. Dahlk, is a state prisoner who has been housed at Oshkosh Correctional Institution (Oshkosh) since May 20, 2003. When an inmate has a medical issue or concern, they must submit a Health Service Request form (HSR) to the Health Services Unit (HSU).

On June 17, 2011, the plaintiff submitted an HSR to HSU, requesting to be

seen for a wound on his inner right leg that had been bleeding.

On June 18, 2011, the plaintiff was seen by defendants Michelle Woomer and Stephanie Friedman, both nurses working in the HSU at Oshkosh. The plaintiff told the nurses that his wound had been periodically, but consistently, bleeding and draining for the past few days. The nurses examined the plaintiff and told him that his wound was closed and that he should request another appointment if and when it reopened. The plaintiff avers that the physical examination lasted only a few seconds. The plaintiff told the nurses that the wound was bleeding, just not at the moment. He specifically requested bandages, knowing that it was policy to provide bandages for all wounds, but his request was denied. Woomer does not remember the plaintiff requesting bandages.

On June 20, 2011, the plaintiff filed an offender complaint through the Inmate Complaint Review System (ICRS) regarding the care he had received from Woomer and Friedman. The plaintiff filed a second offender complaint on June 26, 2011, regarding the care he had received for his wound. This complaint included a request to have an outside physician examine the plaintiff's leg

On July 1, 2011, the plaintiff spoke with an inmate complaint examiner (ICE), Timothy Pierce. The plaintiff expressed his need for medical attention, specifically bandages, due to daily bleeding and pain, and now green discharge from the wound. Pierce responded that there was nothing he could personally do as all medical complaints were handled by ICE Theresa Murphy. Pierce specifically told the plaintiff that he did not want

3

to be involved and denied the plaintiff access to bandages. The plaintiff filed a third offender complaint, this one regarding Pierce's conduct, on July 2, 2011.

The plaintiff wrote two letters to defendant Judy P. Smith, the Warden at Oshkosh, on July 2, 2011, and July 4, 2011. In the second letter, the plaintiff rescinded his request for an outside examination but reiterated that he had not yet received bandages. On July 7, 2011, the plaintiff received a response from Smith that she would not be addressing the plaintiff's letters.

The plaintiff saw another nurse in the HSU on July 7, 2011. She informed the plaintiff that wounds that were draining, or likely to drain, are to be treated with a dressing or bandages and should be monitored. The plaintiff received bandages at this appointment. The next day, the nurse treated the plaintiff's wound with bandages and scheduled him for twice weekly wound monitoring appointments, to begin July 11, 2011.

On July 11, 2011, the plaintiff was seen for his first wound monitoring appointment. He requested antibiotics for a painful infection that he believed had developed within the wound. No antibiotics were prescribed. At the next appointment on July 14, 2011, the wound measurements were the same, but nurses noted that the skin integrity was impaired and the bandage contained non-odorous drainage.

The plaintiff was scheduled for a third wound monitoring appointment on July 18, 2011, but prison staff did not call for the plaintiff to be taken to this appointment. The plaintiff filed an HSR regarding the missed appointment.

4

On July 19, 2011, an HSU nurse examined the plaintiff and noted discharge coming from the wound and that the wound had grown. That same day, defendant Dr. Patrick Murphy ordered a culture to test for an infection in the plaintiff's wound. The plaintiff again requested antibiotics because he believed the wound was infected, but his request was denied. HSU received the results of the culture on July 25, 2011, and they showed the presence of E. Coli in the plaintiff's wound. Dr. Murphy reviewed and initialed these lab results on July 26, 2011. Dr. Murphy avers that the presence of E. Coli did not automatically mean that the wound was infected and that wounds that appear colonized can be treated with wound care and don't necessarily need systemic antibiotics. Dr. Murphy also avers that he "flagged the chart" for assessment by defendant Dr. Mary Sauvey because any decision about whether to treat or not was hers to make because the plaintiff was her patient. (Affidavit of Patrick Murphy, M.D., ¶11, ECF 50).

On August 5, 2011, the plaintiff made a request for the test results from the culture. He was notified on August 10, 2011, that E. Coli was present in his wound, but HSU staff still refused to give the plaintiff antibiotics.

On August 12, 2011, Dr. Sauvey reviewed the plaintiff's chart, including the lab results. Based on her findings and expertise, she ordered a short course of antibiotics, 500 mg of Keflex given twice per day for 10 days. Dr. Sauvey was aware that the plaintiff's chart contained notations that he had an allergy to Penicillin, but the information on his chart was sporadic and inconsistent at best. Severe Penicillin allergies are usually clearly noted

5

in a patient's chart, and there were no such clear, consistent notations in the plaintiff's chart.

The majority of individuals who believe they are allergic to Penicillin are actually able to

take it without incident, either because they were never truly allergic or because their allergy

to Penicillin is mild and/or has resolved over time. People who have a history of allergic

reaction to a medication may become less allergic as time passes. In deciding which

medication to prescribe for the plaintiff, Dr. Sauvey considered the severity of the plaintiff's

Penicillin reaction, the type of infection to be treated, and the list of viable medications that

could be used to effectively resolve the condition. Because there was nothing in the

plaintiff's chart that suggested that his Penicillin allergy was severe, and because his wound

was healing "extremely slowly," Dr. Sauvey "felt it would be best to use a more aggressive

medication in this case." (Affidavit of Mary Sauvey, M.D., ¶34, ECF 45).

The antibiotic Dr. Sauvey prescribed is in a class of drugs called Cephalosporin

antibiotics, which are used to fight bacteria in the body aggressively, and can be tolerated by

patients with a history of Penicillin allergy. "[I]t has a low cross-reactivity with Penicillin;

approximately 17% of patients who have a known Penicillin allergy have a reaction to

Keflex." *Id.* at ¶36. After thoroughly weighing the facts, Dr. Sauvey "believed that Keflex

was a good choice for Mr. Dahlk because it is broad-spectrum and offers promising soft-

tissue infection-fighting coverage, while carrying a low risk of allergic reaction. In the

unlikely event that he did have a reaction to it, I was comfortable with the fact that we were

monitoring him closely in the prison setting." *Id.* at ¶37.

6

Immediately after taking the antibiotic, the plaintiff began suffering severe and extreme abdominal pain, cramping, and diarrhea. The plaintiff brought these issues up during his wound monitoring appointments, but he was told that it was a normal side effect of the medication and that he should not stop taking in. When the plaintiff completed his ten-day course of Cephalexin, he was not prescribed any additional medications.

The plaintiff was scheduled to have wound monitoring appointments on September 18 and 22, 2011, but they did not occur. The plaintiff was told that the appointments were forgotten about, and his complaint regarding the issue was affirmed.

The plaintiff's wound took a long time to heal, mainly because of its location on the body. Between June 18, 2011, and November 25, 2011, the date of his final wound assessment, the plaintiff was seen 29 times regarding his leg wound. Nineteen of those visits were after Dr. Sauvey prescribed the antibiotic medication. At no time was it noted in the plaintiff's medical record that he complained to staff about side effects from, or an allergic reaction to, that medication.

Between August 12, 2011, and November 30, 2011, the plaintiff submitted nine separate HSRs to HSU about various issues. In none of these HSRs did the plaintiff complain that he suffered an allergic reaction to the medication or ask to be seen for a sick call concerning an allergic reaction.

If the plaintiff had a true allergic reaction to Keflex, he likely would have presented with a rash within two to three days of starting the medication. Gastrointestinal

7

issues are not consistent with a true allergy to an antibiotic.

In March 2012, the plaintiff learned that Cephalexin was not supposed to be given to individuals with an allergy to Penicillin. As a result, the plaintiff filed Offender Complaint No. OSCI-2012-6419, which was received on March 27, 2012. The plaintiff writes that he "just discovered" that he was given an antibiotic that he should not have been given due to his Penicillin allergy. (Affidavit of Timothy Pierce, Exhibit 1007, p. 1, ECF 47-5). The plaintiff acknowledges that the ICE may accept a late complaint for good cause and suggests that a doctor giving a wrong medication (and the plaintiff's discovery of the mistake) is a good cause. The complaint was rejected as untimely, and the plaintiff requested review of the rejected complaint. The Reviewing Authority determined that the complaint was appropriately rejected on April 24, 2012.

In April 2012, plaintiff made another new discovery, that Dr. Murphy had reviewed and initialed his culture results but taken no action to inform the plaintiff of the results or prescribe any medication. He then submitted Offender Complaint No. OSCI-2012-7794. Again, the plaintiff acknowledged that a late complaint may be accepted for good cause. But he noted that this information was "newly discovered" and argued that "a doctor failing to treat a serious medical need is good cause." (Affidavit of Timothy Pierce, Exhibit 1008, p. 1, ECF 47-6). This offender complaint also was rejected as untimely. The plaintiff requested review of the rejected complaint, and the reviewing authority determined on May 15, 2012, that the complaint was appropriately rejected.

The plaintiff filed another offender complaint (OSCI-2012-11410) in June 2012 regarding Dr. Murphy's failure to examine the plaintiff after the results of the culture came in. The plaintiff identifies his issue as, "I still have not been examined by a doctor even though orders for a follow up were written almost a year ago." (Affidavit of Timothy Pierce, Exhibit 1009, p. 1, ECF 47-7). The plaintiff called this an ongoing incident, but the complaint was rejected as untimely. The plaintiff requested review of the rejected complaint, and the Reviewing Authority determined on June 27, 2012, that the complaint was appropriately rejected.

The plaintiff filed his § 1983 complaint with this Court on June 4, 2012.

## III. DISCUSSION

The defendants argue that they are entitled to summary judgment on a number of grounds. First, the defendants submit that the plaintiff failed to exhaust his administrative remedies with regard to his claims against defendants Smith, Murphy, and Sauvey. Second, the defendants argue that the plaintiff's leg wound did not constitute a serious medical need, at least not at his first appointment on June 18, 2011. They also argue that they were not deliberately indifferent to the plaintiff's serious medical need. Third, they argue that they are entitled to qualified immunity.

The plaintiff also filed a motion for summary judgment and argued that he is entitled to judgment as a matter of law on all of his claims. However, as briefing progressed, the plaintiff conceded that he did not exhaust his administrative remedies with regard to his

claim against Warden Judy P. Smith. Therefore, his claims against Smith will be dismissed without prejudice. The plaintiff also abandoned his state law medical negligence claims, which the Court allowed him to proceed on at screening.

The Court will first address the defendants' claims regarding exhaustion and then consider the plaintiff's substantive claims against each defendant individually, in the context of both the plaintiff's and the defendants' motions for summary judgment

## A. Exhaustion

Under the Prison Litigation Reform Act (PLRA), "[n]o action shall be brought with respect to prison conditions under Section 1983 of this title or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(e). The PLRA exhaustion requirement requires "proper exhaustion," meaning that a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines. *Woodford v. Ngo*, 548 U.S. 81, 87, 92 (2006); *see also, Pozo v. McCaughtry*, 286 F.3d 1022, 1023 (7th Cir. 2002) ("To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require"). It is defendant's burden to establish that plaintiff has failed to exhaust administrative remedies. *Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002).

The Inmate Complaint Review System (ICRS) is the administrative remedy available to inmates within the Wisconsin prison system for complaints about prison

conditions or the actions of prison officials. Wis. Admin. Code § DOC 310.01(2)(a). The

Wisconsin Administrative Code specifically provides that before an inmate may commence

a civil action, the inmate shall exhaust all administrative remedies that the Department of

Corrections has promulgated by rule. Wis. Admin. Code § DOC 310.05. The ICRS is

available for inmates to "raise significant issues regarding rules, living conditions, staff

actions affecting institution environment, and civil rights complaints." Wis. Admin. Code

§ DOC 310.08(1). However, an inmate may not use the ICRS to raise "[a]ny issue related

to a conduct report, unless the inmate has exhausted the disciplinary process in accordance

with ch. DOC 303." Wis. Admin. Code § DOC 310.08(2)(a).

The defendants argue that the plaintiff failed to exhaust his administrative

remedies with regard to his claims against Drs. Murphy and Sauvey. The plaintiff filed

offender complaints against each of them, but they were rejected as untimely. "An inmate

shall file a complaint within 14 calendar days after the occurrence giving rise to the

complaint, except that the institution complaint examiner may accept a late complaint for

good cause." Wis. Admin. Code § DOC 310.09(6). The plaintiff acknowledged in his

March and April 2012 offender complaints against Drs. Sauvey and Murphy that his

complaints were untimely and that they could be accepted by the ICE for good cause. The

plaintiff mentioned in both offender complaints that he had just discovered the factual basis

for the complaint and implied that the severity of the doctors' actions justified an exception

to the time limit. But the ICE did not consider the plaintiff's new discovery of these issues

11

to be good cause and rejected the complaints. The plaintiff then requested review of each

rejected complaint pursuant to Wis. Admin. Code § DOC 310.11(6). The reviewing

authority "shall only review the basis for the rejection of the complaint. The reviewing

authority's decision is final." *Id.* The plaintiff believed he had good cause to file untimely

complaints and did all he could to exhaust his claims against Drs. Sauvey and Murphy.

Additionally, the defendants suggest that with regard to Dr. Murphy, the

plaintiff did not wait until his offender complaint process was completed before filing this

lawsuit. The record reveals that this action began on June 4, 2012, before the Reviewing

Authority determined on June 27, 2012, that the plaintiff second complaint against Dr.

Murphy was appropriately rejected. However, that complaint addressed the issue of a follow

up appointment, which is not central to this case. The plaintiff had already gone through ad

much process as he could on his claim that Dr. Murphy received the culture results and did

not inform the plaintiff of the results or take any action.

The Court will not grant defendants' motion for summary judgment on

plaintiff's claims against Drs. Murphy and Sauvey on exhaustion grounds.

## B. Eighth Amendment Claims

In *Duckworth v. Ahmad*, 532 F.3d 675, 678-79 (7th Cir.2008), the Seventh

Circuit set forth the legal standard for Eighth Amendment medical care claims:

> The states have an affirmative duty to provide medical care to
> their inmates. *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct.
> 285, 50 L.Ed.2d 251 (1976). And the upshot of this duty is that
> the "deliberate indifference to [the] serious medical needs of

prisoners constitutes the 'unnecessary and wanton infliction of pain'" and violates the Eighth Amendment's prohibition against cruel and unusual punishments. *Id.* at 104, 97 S.Ct. 285. To state a cause of action, a plaintiff must show (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent. *Sherrod v. Lingle*, 223 F.3d 605, 610 (7th Cir.2000).

Woomer argues that the plaintiff's leg wound did not constitute a serious medical need when she first examined him on June 18, 2011. However, for the purposes of the defendants' motions for summary judgment, the Court will view the evidence in the light most favorable to the plaintiff and assume that plaintiff's leg wound constituted a serious medical need.

Consequently, the Court must consider whether each defendant was deliberately indifferent to the plaintiff's serious medical need during the course of his treatment.

> Deliberate indifference is a subjective standard. *Johnson*, 444 F.3d at 585. To demonstrate deliberate indifference, a plaintiff must show that the defendant "acted with a sufficiently culpable state of mind," something akin to recklessness. *Id.* A prison official acts with a sufficiently culpable state of mind when he knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk. *Roe*, 631 F.3d at 857. Deliberate indifference "is more than negligence and approaches intentional wrongdoing." *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir.1998). In other words, "[d]eliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir.2008). "A jury can infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Id.* (quotation marks omitted). A plaintiff can show that the professional disregarded the need

13

> only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that "no minimally competent professional would have so responded under those circumstances." *Roe*, 631 F.3d at 857 (quotation marks omitted).

*Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir.2011).

### 1. Woomer and Friedman

Even viewing the evidence in the light most favorable to the plaintiff, there is no indication of deliberate indifference by Woomer or Friedman on June 18, 2011. They assessed the plaintiff's wound, including that it was closed and was not draining or discharging. Woomer even had her supervisor, Friedman, double check her conclusion. Since the plaintiff did not have an open or discharging wound, he did receive have bandages, assuming he asked for them, as he avers. For the purposes of summary judgment, the Court also will consider the plaintiff's averment that the physical examination took only a few seconds. No reasonable jury could conclude that a great length of time was necessary to observe the wound to see if it was open or closed.

The plaintiff attempts to argue that the wound was the same as when another nurse determined that he needed additional monitoring and treatment on July 7, but that is not the case. The appointment on June 18, 2011 was the first time a medical professional saw the wound. Although the plaintiff told them that it had been draining, it was closed at the visit, which could have led the nurses to conclude that it was healing. Nevertheless, the nurses advised the plaintiff to contact health services if the wound opened up again.

14

Presumably following those instructions is how he came to be treated on July 7, 2011.

Defendants Woomer and Friedman are entitled to summary judgment on the plaintiff's

claims against them.

### 2. Pierce

The plaintiff's claims against Pierce arise from the plaintiff approaching Pierce

about his medical problems on July 1, 2011. The plaintiff expressed his need for medical

attention, specifically bandages, due to daily bleeding and pain and green discharge from the

wound. Pierce responded that there was nothing he could personally do as all medical

complaints were handled by ICE Theresa Murphy. Pierce specifically told the plaintiff that

he did not want to be involved and denied the plaintiff access to bandages.

The plaintiff argues that Pierce had a duty to act due to a prison policy that

allows inmates to contact any staff member to request of medical attention if the inmate is

suffering from a medical emergency. The plaintiff asserts that he made a clear and explicit

request to Pierce and that Pierce was required to respond by either informing the plaintiff that

there was no medical emergency or by summoning an individual who could properly treat

the plaintiff's injuries.

No reasonable jury could conclude that Pierce was deliberately indifferent to

the plaintiff. Even if Pierce violated the technical requirements of a prison policy, that does

not automatically constitute a constitutional violation. Pierce promptly responded to the

plaintiff that medical complaints were not his responsibility and directed the plaintiff to ICE

Theresa Murphy, who was responsible for them. Also, it is difficult to understand how the plaintiff's request to Pierce for medical attention and bandages could be a medical emergency when the plaintiff had not submitted any HSRs concerning his wound from the time he was seen on June 18, 2011, until well after he filed his second offender complaint on June 26, 2011.

Ultimately, a prison official cannot be held liable for failing to take action outside of his job duties. *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). Section 1983 makes public employees liable "for their own misdeeds but not for anyone else's." *Id.* at 596. Pierce is entitled to summary judgment on the plaintiff's claims against him.

### 3. Murphy

The plaintiff argues that Dr. Murphy received the results of the culture of his wound and did not inform the plaintiff of the results or take any action to change the plaintiff's treatment.

As an initial matter, although the plaintiff submits that the test results were received on July 21, 2011, and that Dr. Murphy reviewed and initialed the results on July 22, 2011, the documentary evidence and Dr. Murphy's affidavit alter those dates. *See* Affidavit of Mary Sauvey, M.D., Exhibit 1000, p. 22, ECF 45. The results themselves were verified by Dynacare Laboratories on July 22, 2011. There is a stamp showing that they were received by the Oshkosh HSU on July 25, 2011, and Dr. Murphy has averred that his initials and date were written on July 26, 2011. There is also a note that a copy was given to the

16

patient for free on August 10, 2011.

Reading only the plaintiff's argument, it sounds bad that the presence of E. Coli was noted but not communicated to the plaintiff or acted upon. However, Dr. Murphy has averred the presence of E. Coli did not automatically mean that the wound was infected and that wounds that appear colonized can be treated with wound care and don't necessarily need systemic antibiotics. Dr. Murphy also avers that he flagged the chart for assessment by defendant Dr. Mary Sauvey because any decision about whether to treat or not was her to make because the plaintiff was her patient. No reasonable jury could conclude that Dr. Murphy's reliance on the plaintiff's treating physician to review the culture results and make a decision regarding medical treatment constituted deliberate indifferent to the plaintiff. The Court will grant summary judgment in favor of Dr. Murphy.

### 4. Sauvey

The plaintiff's claim against Dr. Sauvey focuses on the prescription she chose for him despite his known Penicillin allergy. Once again, the plaintiff's argument that Dr. Sauvey knew he was allergic to Penicillin and nevertheless prescribed an antibiotic that could cause an allergic reaction sounds very serious. However, in her affidavit, Dr. Sauvey presented at great length her reasoning for choosing the antibiotic she did. "A jury can infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Arnett*, 658 F.3d at 759 (quoting *Duckworth*, 532

F.3d at 679). That is not the case here. Absent some type of expert testimony suggesting that Dr. Sauvey's exercise of judgment was flawed, no reasonable jury could conclude that she was deliberately indifferent to the plaintiff's Penicillin allergy or any reaction that might result from the medicine she prescribed.

Also, to the extent that the plaintiff claims he received inadequate treatment overall for his leg wound, the medical evidence in the record shows treatment that was not deliberately indifferent. The plaintiff was seen the day after he submitted his first HSR. Then, between his first appointment on June 18, 2011, and his second appointment on July 7, 2011, it is unclear whether the plaintiff submitted any HSRs or requested to be seen. He filed several offender complaints, talked to Pierce, and wrote to Smith twice, but he has not shown that he asked HSU or medical staff for treatment and was denied. After his July 7, 2011, appointment, the plaintiff received regular care for his wound. The wound was slow to heal, staff caused the plaintiff to miss a few wound treatment appointments, he disagreed with the conclusion of Dr. Murphy regarding whether action was necessary based on the culture results, and he disagreed with Dr. Sauvey's choice of antibiotic for him. However, the plaintiff was seen 29 times, his wound was cared for, and the doctors were reviewing the available information and exercising their professional judgment regarding the course of treatment.

That a prisoner received some treatment does not foreclose his deliberate indifference claim if the treatment received was "so blatantly inappropriate as to evidence

18

intentional mistreatment likely to seriously aggravate his condition." *Arnett*, 658 F.3d at 759 (quoting *Greeno*, 414 F.3d at 653). Based on the evidence in the record, even viewed in the light most favorable to the plaintiff, no reasonable jury could conclude that Dr. Sauvey's medical decisions were blatantly inappropriate or constituted intentional mistreatment. Dr. Sauvey is entitled to summary judgment.

## C. State Law Medical Negligence Claims

The plaintiff has not identified a medical expert or introduced any evidence from an expert in support of or in response to motions for summary judgment. Unless the situation is one in which common knowledge affords a basis for finding negligence, medical malpractice cases require expert testimony to establish the standard of care. *Carney-Hayes v. Nw. Wisconsin Home Care, Inc.*, 2005 WI 118 ¶ 35, 284 Wis.2d 56, 699 N.W.2d 524 (2005). The plaintiff did not respond to the defendants' argument that his failure to identify a medical expert is fatal to his medical negligence claims and therefore has abandoned the claims. Defendants Murphy, Sauvey, Woomer, and Friedman are entitled to summary judgment on these claims.

## IV. ORDER

**IT IS THEREFORE ORDERED** that the motion for summary judgment filed by defendants Stephanie Friedman, Patrick Murphy, Timothy Pierce, Mary Sauvey, and Judy P. Smith (Docket #42) is **granted**.

**IT IS FURTHER ORDERED** that defendant Michelle Woomer's motion for

summary judgment (Docket #51) is **granted**.

IT IS FURTHER ORDERED that the plaintiff's motion for summary judgment (Docket #55) is **denied**.

IT IS FURTHER ORDERED that Judy P. Smith is **dismissed without prejudice** as a defendant to this action.

IT IS FURTHER ORDERED that the plaintiff's motion to withdraw Document No. 57 and replace it with the attached Affidavit of John G. Dahlk and exhibits (Docket #59) is **granted**.

IT IS FURTHER ORDERED that the Clerk of Court shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 31st day of March, 2014.

SO ORDERED,

HON. RUDOLPH T. RANDA
U. S. District Judge